HUGH A. THOMPSON et al. v. TIMOTHY J. LYONS. and SAMUEL B. STROTHER, Administrator of Estate of FRED MEYN, Appellants.

Division Two, March 13, 1920.

1. **PLEADING: Cause of Action: Fraud and Deceit.** A petition alleging that defendants represented to plaintiffs that a certain tract of 10.4 acres was worth $3000 an acre, that it could be bought for such sum, that relying on said representations plaintiffs put up $16,200 for the purchase of a half interest in the land, that said representations were false and made to deceive and defraud plaintiffs, states a cause of action with sufficient clearness to authorize the introduction of evidence to support it, there being no demurrer filed.

2. **FRAUD AND DECEIT: Verdict of Jury.** The verdict of a jury in an action for fraud and deceit concludes the credibility of the witnesses who testified to the substantial facts necessary to support a petition stating a cause of action.

3. **LIMITATIONS: Purchase of Land Situate in Another State: Applicatory Statute.** In an action for fraud and deceit, practiced by defendants upon plaintiffs, resulting in the purchase of land situate in another state, the question of limitations is governed by the statute of such foreign state, since the transaction occurred in said state, although the suit is brought in this State.

4. ———: **Fraud: Discovery: Diligence.** The statute of the foreign state in which the land transaction occured, providing that "an action for relief on ground of fraud" shall be brought within two

Thompson v. Lyons.

years, but that "the cause of action shall not be deemed to have accrued until the discovery of the fraud," cannot be held to bar the action on the sole ground that no facts were pleaded or proven to show that reasonable diligence was used to discover the fraud.. The said statute has been construed by the courts of the foreign state to mean that if for any reason no obligation exists to consult the record which the law requires to be kept as the source of information, or if the defrauded person be circumvented from taking advantage of his opportunity, no duty rests upon the defrauded person to improve with diligence the opportunity of learning that which the record discloses. No duty rests upon the defrauded person to examine records which do not impart notice, but which are the records of a private realty company, to whose books he has no right of access.

5. ———: ———: ———: ———: **Recorded Deed: Consideration of One Dollar.** The Supreme Court of Kansas holds that a record imparts notice only of what it contains. The record of a deed reciting a consideration of one dollar is not notice that the purchase price of the land was $14,920, instead of $32,400, which defendants represented to plaintiffs was the purchase price. That record imposed no duty on plaintiffs to use diligence to discover the fraud.

6. ———: ———: ———: ———: **Fiduciary Relation: Partners.** Where plaintiffs and defendants had entered into partnership for the purchase of the land and defendants represented to plaintiffs that the land was worth $32,400 and induced plaintiffs to put up $16,200 for the purchase of a half interest, and with the money thus placed in their hands defendants bought the entire tract for $14,960, and a deed conveying the tract to one of them expressed a consideration of only one dollar, there existed a fiduciary relation, and the plaintiffs had a right to rely on defendants' representations and were not required to use diligence to discover that they were false, and the Statute of Limitations did not begin to run until they actually discovered the fraud.

7. ———: ———: ———: ———: **Pleading.** Where plaintiff merely alleges that he did not discover the fraud until a certain date, and defendant, without questioning the sufficiency of the petition, goes to trial, he cannot complain that the petition did not sufficiently plead reasonable diligence to discover the fraud. Besides, where the bar to the action is first raised by defendant's plea of the statute of the state where the transaction occured, and in reply to that plea plaintiff alleges that the facts constituting the fraud were not discovered by him until a certain date, and no objection to the sufficiency of the reply is made, there is no room for a complant that the petition did not allege reasonable diligence to discover the fraud.

8. ———: ———: **Time Between Death of Defendant and Adminis-tration.** The time elapsing between the death of a defendant and the appointment of his administrator is excluded in computing the time the Statute of Limitations has run. So that, in an action for fraud and deceit, if the time between the date when the fraudulent transaction was closed up and the date when defendant's administrator was brought in has not been five years, excluding the time which elapsed between the death of the defendant and the appointment of his administrator, the action is not barred by the Missouri Statute of Limitations.

9. **FRAUD AND DECEIT: Immoral or Illegal Contract: Unawful Use of Official Position: Recovery.** Courts refuse to grant relief for gambling and other immoral or unlawful contracts, either by enforcing them, or by awarding damages for the breach of them; but where one of the parties is defrauded by a transaction against public policy, he may recover in an action for fraud and deceit the money fraudulently obtained from him. So that where defendants induced plaintiffs to put up money for a half interest in land to be purchased and falsely represented that the property was worth $32,400 and could not be purchased for less, and further represented that plaintiffs should not be known in the deal for the reason one of defendants was a county commissioner and the other a member of the drainage board and they could get the property cheaper if plaintiffs were not known in the deal, and plaintiffs put up $16,200 and the deed expressed a consideration of only one dollar and named only one of the defendants as grantee, and it afterwards developed that the entire property had been bought for only $14,960, a recovery by plaintiff's in their action of fraud and deceit, is not precluded on the theory that they and defendants had entered into an illegal contract or scheme, out of which defendants' liability arose. The rule is that if defendants by misrepresentation of certain facts, or by an illegal use of their official position, induced plaintiffs to enter into an illegal contract and thereby defrauded plaintiffs out of their money, defendants cannot resist recovery by plaintiffs in an action of fraud and deceit on the ground that the scheme was unlawful.

10. ———: **Measure of Damages.** Where one person makes a purchase for another, or where one of two or more joint purchasers conducts a joint purchase, and falsely represents that the price is actually greater than what is actually paid for the property, the measure of damages is the difference between the amount actually paid by the party defrauded and the true purchase price. So where defendants, in an endeavor to induce plaintiffs to join with them to purchase land, represented that the property was worth $3000 per acre, whereas it was actually bought by defendants for less than $1500 per acre, the court properly re-

fused an instruction directing the jury to return a verdict for defendants if at the time plaintiffs bought a half interest the property was reasonably worth $3000 per acre; but properly instructed the jury to assess plaintiffs' damages, if they found for plaintiffs, at the difference between what plaintiffs paid defendants for a half interest and one-half the amount defendants actually paid to the grantor for the entire tract.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner*, Judge.

AFFIRMED.

*John H. Lucas, William G. Holt* and *C. W. Trickett*, for appellants.

(1) The amended petition does not state facts sufficient to constitute a cause of action against defendants, because: The gist of the action is alleged fraud inducing the sale and purchase of real estate. (a) The contract is not charged to be in writing; therefore, it must be presumed to rest in parol. The Statute of Frauds applies, and no cause of action can be stated. Sec. 2783, R. S. 1909; Knight v. Rawlings, 205 Mo. 412. (b) The amended petition fails to state a single act upon the part of the defendants or either of them which concealed or tended to conceal the alleged fraud. "It must be of an affirmative character and must be alleged and proved." State ex rel. v. Musick, 145 Mo. App. 33. (c) "General allegations of fraud or other general allegations, no facts being stated, are but legal conclusions, and for that reason are insufficient." The amended petition does not charge that the defendants falsely and fraudulently did any particular thing. The amended petition merely charges that the defendants made certain representations which, they allege, turned out to be false. (d) Especially is this true of the separate replies filed by plaintiffs to the separate answers of the defendants. In each separate reply it is alleged generally "that by the acts and conduct of defendants and each of

28—281 Mo.

them, . . . secretly and surreptitiously perpetrated said fraud and concealed the facts," etc. Not a single fact is alleged. Hoester v. Sammelmann, 101 Mo. 624. (e) "A mere charge of fraud, without specification of the act or acts which constitute the alleged fraud, amounts to nothing in pleading." Newman v. Trust Co., 189 Mo. 444. (f) A party seeking to avoid the bar of the statute of limitations on account of fraud, must aver and show that he used due diligence to detect it. Shelby County v. Bragg, 135 Mo. 300. (g) The petition must charge and the evidence must show, that it was by reason of something defendants did or said that the alleged fraud was not discovered sooner. Callan v. Callan, 175 Mo. 346. (h) In the instant case the alleged fraud was not of a secret nature. It was a matter open to the plaintiffs at all times. "By inquiry of the owner of the land they could have learned that fact, and there is no evidence that defendants did or said anything to prevent a discovery of the alleged fraud." Scott & Bowker v. Boswell, 136 Mo. App. 606. (i) The question is not whether the plaintiffs were merely ignorant of the facts constituting the cause of action. Such ignorance will not suspend the operation of the statute unless it can be properly attributed to the fraudulent concealment of the facts by defendant. Wells v. Halpin, 59 Mo. 97; Johnson v. United Rys., 243 Mo. 298. (j) It is essential to state a cause of action based upon fraudulent representations, that it be charged in the petition that plaintiff was deceived thereby, and relying upon such representations, he was induced to act to his injury. There is neither allegation nor proof that the alleged false representations induced plaintiffs to purchase the real estate in question. Remmers v. Remmers, 217 Mo. 556; Powell v. Adams, 98 Mo. 604. (k) False representations, to be actionable, must relate to a past or existing fact; and a promise to perform something in the future, standing alone, cannot be made the basis of an action for fraud. Stockings v. Howard, 73 Mo. 25; Bullock v. Wooldridge, 42 Mo. App. 356; Davidson v. Hobson, 59 Mo. App. 130; Mathews v. Eby, 149 Mo.

App. 157. (1) As a general rule representations made during the negotiation of a contract, which show on their face that they were not intended as a statement of existing facts, but as a prophecy of things to come, do not constitute actionable representations, however, wide of the event the prediction may turn out to have been. McFarland v. Railway Co., 125 Mo. 253; Bretzfelder v. Waddle, 122 Mo. App. 462. (2) The transaction complained of having occurred in the State of Kansas, the Statute of Limitations of that State applies. The cause of action having accrued more than two years prior to the commencement of the action, the cause was barred. Sec. 6907, General Statutes of Kansas, 1915, same being Sec. 17, Chap. 182, Session Laws of Kansas 1909. (a) There is neither allegation nor proof that plaintiffs used any diligence to discover the alleged fraud; there is neither allegation nor proof that the defendants or either of them said or did anything to prevent the discovery of the alleged fraud, and for these reasons the plaintiffs are not entitled to recover. Callan v. Callan, 175 Mo. 346. (b) A party seeking to avoid the bar of the statute on account of fraud, must aver and prove that he used diligence to discover it, and if he had means of discovery in his power, he will be held to have known it. Shelby County v. Bragg, 135 Mo. 300. (c) A party cannot avail himself of the exception to the statute where the means of discovering the truth were in his power and not used. Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. Shelby County v. Bragg, 135 Mo. 300; Callan v. Callan, 175 Mo. 361; State ex rel. v. Yates, 231 Mo. 276; Johnson v. Railways, 243 Mo. 278; State ex rel. v. Hawkins, 103 Mo. App. 251; Brady v. Insurance Co., 180 Mo. App. 214. (d) Mere silence will not excuse the failure to discover the fraud or concealment. Hoester v. Sammelmann, 101 Mo. 619.; Stark v. Zehnder, 204 Mo. 453; Scott v. Boswell, 136 Mo. App. 610; Shelby County v. Bragg, 135 Mo. 291; Schrock

v. Duncan, 189 S. W. 610. (3) The mere fact that plaintiffs looked upon and considered defendant, Lyons, as a personal friend, in no wise created or constituted a confidential relation, and he did not sustain any such relation within the law. "He was at most but a friend of the family and received no compensation whatever for his acts in assisting them," in the purchase of the real estate. Knight v. Rawlings, 205 Mo. 434. (4) The court erred in excluding evidence offered by defendants, showing that the fair market value in 1911 of the real estate in question was four thousand dollars per acre. This evidence was competent for the purpose of showing that plaintiffs suffered no damages. (a) The terms of the contract were reduced to writing, and the written contract, which is in no wise challenged, speaks for itself. The measure of damages in action of this character is the difference between the reasonable market value of the thing sold and the contract price thereof. Thompson v. Newell, 118 Mo. App. 405; Pickett v. Wren, 187 Mo. App. 89; Vlates v. Catsignianis, 202 S. W. 441. (b) But in this action it cannot be said that the price paid by defendants indicates the market value any more than the price paid by plaintiffs to defendants. "It is axiomatic that fraud, to be actionable, must result in damages to the parties suing therefor. Stacey v. Robinson, 184 Mo. App. 64. The burden was upon plaintiffs to prove that they suffered damages recoverable under the rule stated above." Vlates v. Catsignianis, 202 S. W. 441. (5) The court erred in refusing instruction numbered M, tendered by defendants and refused by the court. The substance of this instruction is that if the real estate in question was of the actual value of $3,000 per acre at the time plaintiffs made the purchase then the verdict must be for the defendants. This is the rule of law as announced in: Thompson v. Newell, 118 Mo. App. 405; Vlates v. Catsignianis, 202 S. W. 441. (6) The court erred in refusing to give instruction numbered R, tendered by the defendants. This instruction stated "that there is no element of partnership in this case." This instruction ought to have been given.

The plaintiffs, throughout their testimony, call the deal one of partnership, which undoubtedly had its effect upon the jury in returning a verdict for plaintiff. Sec. 2783, R. S. 1909. An essential allegation is that plaintiffs were deceived, but their petition will be searched in vain for such an allegation.

*Cooper, Neel & Wright* for respondents.

(1) The pleadings in the case state a complete cause of action against each of the defendants. Remmer v. Remmer, 217 Mo. 557; Judd v. Walker, 215 Mo. 335; Monmouth College v. Dockery, 241 Mo. 554; Corder v. O'Neill, 176 Mo. 436; Rutledge v. Tarr, 95 Mo. App. 268. (2) The Statute of Frauds has no application to the case. Corder v. O'Neill, 176 Mo. 437. Besides it is an affirmative defense and must be pleaded to be availed of. Morrmeister v. Hannibal, 180 Mo. App. 725; Phillips v. Hardenburg, 181 Mo. 473. (3) The pleadings sufficiently stated the facts in reference to concealment. Monmouth College v. Dockery, 241 Mo. 555. (4) The petition was sufficient as to the allegations of diligence. Monmouth College v. Dockery, 241 Mo. 552; Cottrell v. Krum, 100 Mo. 403; Bent v. Priest, 86 Mo. 489; Kelly v. Peoples, 182 S. W. 808; Hunter v. Hunter, 50 Mo. 452. (5) The statements made by Lyon and Meyn as to what was being paid for the land in question and as to its value, etc., are actionable. Johnson v. Gavitt, 86 N. W. 256; Bergeron v. Miles, 60 N. W. 783; Kelly v. Peoples, 182 S. W. 811; Dorr v. Cory, 87 N. W. 684. (6) Plaintiffs were damaged and the correct measure of damage was sued for and recovered in this case. Bergeron v. Miles, 60 N. W. 783; Mayo v. Wahlgren, 50 Pac. 40; Johnson v. Gavitt, 86 N. W. 256. (7) Under the statutes and decisions of the State of Kansas, as well as of Missouri, the Statute of Limitations does not begin to run until the discovery of the fraud and the Statute of Limitations is no defense under the facts in this case. Statutes of Kansas, 1915, sec. 6907; Klamm v. Claus, 67 Pac. 542; Brown v. Brown, 64 Pac.

601; Marborough v. McCormack, 23 Kan. 43; Perry v. Ray, 2 Pac. 787; McMillen v. Winfield, 67 Pac. 892; R. S. Mo. 1909, sec. 1889.; Monmouth College v. Dockery, 241 Mo. 551; Hunter v. Hunter, 50 Mo. 452; Cottrell v. Krum, 100 Mo. 402; Judd v. Walker, 215 Mo. 330; State ex rel. v. Hawkins, 103 Mo. App. 254; Bent v. Priest, 86 Mo. 475. (8) The demurrers in the case of both defendants were properly overruled. Judd v. Walker, 215 Mo. 335; Corder v. O'Neill, 176 Mo. 436; Rutledge v. Tarr, 95 Mo. App. 268. (9) The testimony as to the market value of the land was immaterial and properly excluded. Johnson v. Gavitt, 86 N. W. 256; Bergeron v. Miles, 60 N. W. 783. (10) The court correctly gave plaintiffs' instruction numbered 3. Bergeron v. Miles, 60 N. W. 783; Rutledge v. Tarr, 95 Mo. App. 268; Mayo v. Wahlgren, 50 Pac. 44; Jefferson City Savings Assn. v. Morrison, 48 Mo. 274; Caldwell v. Henry, 76 Mo. 257; McBeth v. Craddock, 28 Mo. App. 398; Arthur v. Wheeler and W. M. Co., 12 Mo. App. 341. (11) The verdict and judgment are for the right parties and should be affirmed. Judd v. Walker, 215 Mo. 333; Monmouth College v. Dockery, 241 Mo. 522.

WHITE, C.—The plaintiffs, in the Circuit Court of Jackson County, June 6, 1917, in an action for fraud and deceit, recovered judgment against the defendants in the sum of $11,835.95, and the defendants appealed. The suit was begun against Lyons and Fred Meyn, and afterwards, on the suggestion of the death of Meyn, his administrator, Strother, was made party defendant, and an amended petition was filed.

The amended petition on which the trial was had alleged in substance that in June, 1911, and for a long time prior thereto, the plaintiffs were well acquainted with Lyons and Meyn and reposed confidence in them; that in the forepart of June, 1911, Lyons and Meyn represented to plaintiffs that they had an offer of two tracts of land in Kansas City, Kansas, comprising 10,814 acres, for sale at a price of $3,000 per acre; that the land was easily worth the price; that Lyons and Meyn were well acquaint-

ed with such values, and the land could not be bought for less money; that they desired the plaintiffs to go in with them in the purchase of said land at $3,000 an acre, in which the plaintiffs were to take a half interest and pay one-half the purchase price; that the plaintiffs had no knowledge of the value of such land and relied upon the representations of Lyons and Meyn as to the value of the land and the price to be paid for it; that afterwards Lyons and Meyn represented that they had bought the land at $3,000 per acre, and requested the plaintiffs to pay one-half the purchase price; and the plaintiffs, relying upon the truthfulness of the statements, paid to Lyons and Meyn one-half of the supposed purchase price of three thousand dollars per acre, a total sum of $16,200; that Lyons and Meyn secured title to the property and caused the same to be conveyed to said Meyn; that Meyn thereupon transferred to Frank Thompson, for the benefit of the plaintiffs, an undivided one-half interest in the same; that the land was not worth $3,000 per acre; that instead of Lyons and Meyn paying for the land $3,000 an acre, or $32,442, as they fraudulently stated to the plaintiffs, they paid for all of said land only $14,920 or $1,362.29 per acre; that Lyons and Meyn paid the entire purchase price out of the money plaintiffs paid, and retained $1,280 themselves; that plaintiffs first learned in May, 1916, that the said representations were false; that by reason of the said fraud the plaintiffs were defrauded out of the sum of $8,740 on the 11th and 19th of July, 1911, and ask judgment for that sum, with interest.

The defendants filed separate answers, each substantially setting up the same defense. After a general denial it is alleged in defense that the facts stated in the amended petition arose wholly in the State of Kansas and are governed by the laws of Kansas. The answers then set up in bar of the action the Statute of Limitations of Kansas as follows:

"Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action shall have accrued and not after-

wards. . . . (3) Within two years; . . . an action for relief on the ground of fraud—the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud.''

The answers further set up in defense the Statute of Limitations of the State of Missouri in that the cause of action accrued more than five years before, and that the plaintiff knew, or by the exercise of reasonable diligence could have known, all the matters alleged in the petition more than five years prior to the commencement of the suit, and for that reason the action was barred by both the Statute of Limitations of Kansas and the Statute of Limitations of Missouri.

In reply to each separate answer the plaintiffs denied each and every allegation in the answers contained except that Strother was the administrator of Fred Meyn; denied that the cause of action was barred by the Statute of Limitations, and alleged that ''the facts constituting fraud, pleaded in plaintiff's amended petition, were not discovered by plaintiffs until June, 1916, and a few days prior to the institution of this suit, and that defendants Lyons and Meyn concealed said fraud and the matters, facts and things constituting the same, as well as any means or sources of information, by or through which plaintiffs, by the exercise of ordinary diligence could have discovered same.'' The reply further alleged that by reason of the relation that existed between plaintiffs and defendants, and by reason of the confidence plaintiffs reposed in defendants, and by reason of the statements of defendants, and each of them, plaintiffs were induced not to let themselves be known in said transaction and not to make any inquiry concerning the same.

A trial by jury resulted in a verdict and judgment for plaintiff for the amount sued for, with six per cent interest from the date the money was paid.

Hugh Thompson, one of the plaintiffs, testified that he had known defendant Timothy J. Lyons in the Philippine Islands; had been there in the war and had known him since 1902; that he had known Meyn about the same

length of time; that he lived two and a half or three blocks from Lyons and saw him probably every evening prior to June, 1911. He first got acquainted with Lyons when Lyons was running for alderman in the sixth ward in Armourdale, and he assisted and spent money in helping elect him. Witness had a nickname of "Frock" by which Lyons called him. He related the statements of Mr. Lyons to him, as follows:

"I met Mr. Lyons another evening, and he said, 'Frock, do you want to make some money, you have always helped me in political matters, and I want to make you a lot of money,' and I said, 'How is that, Tim;' and I commenced laughing, and he said, 'There is a piece of land out here I can buy for $3,000 an acre, and I want you to go in with me, and Frank and Meyn, and buy that.' I said, 'Let's go out and look at it,' and we jumped in the car and went out and looked at it, and I said, 'Is it all right, Tim?' and he said, 'Yes, it is a good buy,' and I said, 'All right, Tim, go ahead and buy it,' and it was $3,000 an acre. They went ahead and bought the ground."

Witness stated that his brother was present and heard the conversation; witness then stated further, when himself, his brother and Lyons were present:

"Q. Go ahead and state what occurred at the time the three of you went out there? A. Tim said, 'I and Fred Meyn can buy this ground for $3,000 an acre.' He said, 'We have not enough money to buy it, and I want you boys'—he kept talking to me all the time, he was not very well acquainted with Frank, because Tim and me had been friends and I considered him one of my friends, and up to today I have not had the abstract examined to that property,—

"Q. (Interrupting) When he said, 'You boys,' who was it he referred to? A. To Frank and I. He said, 'I want to make you boys some money,' and I said, 'Is this property worth the money?' and he said, 'Yes, it is cheap.' He said, 'Fred Meyn and I will buy this property, and we want you to go in with us, but we don't want you to be known in the deal until we get the abstract.'

"Q. Was there any talk as to what interest you would have in the property? A. One-half interest.

"Q. One-half to whom? A. One-half to the two Thompsons, and one-fourth to Mr. Fred Meyn, and one-fourth to Mr. Tim Lyons, and I said, 'Why don't you want me to be known in the deal?' and he said, 'I am County Commissioner, and Fred Meyn is president of the Drainage Board'—or a member of the Drainage Board—and for the Stock Yards Company we have done a lot of favors, and we can get this cheaper by your not being known in the deal.' . . .

"Q. What part of the money were each of you to put up? A. We were each to put up one-half; the Thompsons were to put up one-half, and Mr. Fred Meyn one-fourth, and Mr. Tim Lyons one-fourth.

"Q. On what basis per acre? A. $3,000 per acre.

"Q. Now, did you have any subsequent meeting at which any of you were present, if so, which ones? A. We did meet several times in front of Mr. Lyons's and talked it over.

"Q. Was Mr. Meyn present at any of those meetings? A. Yes sir."

In relating a conversation when Meyn was present, he continued:

"A. In the evening we met there in front of Mr. Lyons's house, and Mr. Meyn said, 'Now, this is a great buy'—

"Q. (Mr. Neel): Not what Mr. Meyn said. A. Mr. Lyons said, 'This is a great buy, and I would not let no one else in on this at all, because there is a man by the name of Rieger, of the Rochester Brewing Company, wanted in on this, but he never helped me like you have in politics, and I want you in,' that is what Mr. Tim Lyons said. . . .

"Q. Any other conversation in the presence of Mr. Meyn, not what he said. Any conversation when he was present, between you and your brother or Mr. Lyons? A. Mr. Lyons said that they were members of the Drainage Board and members of the County Commissioners,

and they didn't want us known in the deal until it was closed up.

"Q. At any time when Mr. Meyn was present was the purchase price referred to? A. At $3,000.

"Q. And when Mr. Meyn was present, was anything said between you and Mr. Lyons, or your brother and Mr. Lyons, as to what interest you would have? A. One-half interest. . . .

"Q. Now, how long did these talks and negotiations prolong, Mr. Thompson, before any check was given? Approximately, I mean? A. Three or four days.

"Q. Now, was there any talk back and forth between yourself and Mr. Lyons going over this matter, between the first two or three conversations that you have spoken about, and the time the check was given, if one was given? A. Oh, yes; we talked every evening, or practically every evening.

"Q. Was Mr. Meyn present at any of those subsequent times? A. Yes sir."

Thompson further stated that Lyons told him the trade was closed and the property had cost $3,000 an acre, and requested a check for plaintiffs' half of the purchase price.

Plaintiffs also introduced a check signed, "J. L. Thompson by H. A. Thompson," dated July 11, 1911, for $15,600 payable to Fred Meyn and T. J. Lyons, endorsed on the back, "Paid 7-12-11. T. J. Lyons" and "Fred Meyn." Thompson swore he gave that check to Lyons and Meyn and that they went to the bank and got the cash on it; also a check signed in the same way, dated July 19, 1911, payable to Fred Meyn for $600, and endorsed on the back "Fred Meyn;" also a receipt signed by Lyons and Meyn dated July 11, 1911, for $15,600 for an undivided half interest in a tract of land containing 10.4 acres in Kansas City, Kansas, which Thompson swore was given when the check in the amount named was delivered.

Thompson further stated that after he had paid $15,600, Lyons came to him and said there was a mistake in the amount of land, and that Thompson owed

$600 more. He thereupon gave the second check for $600 to Fred Meyn. Lyons again told him that the ground cost $32,400; that they were all in partnership and that the witness and his brother owned each a fourth; that Lyons owned a fourth and Fred Meyn a fourth.

On cross-examination the witness went over the testimony in detail, stating that all four of the parties, the plaintiffs and Lyons and Meyn, had talked over the land trade, and that in one of these conversations plaintiff told Lyons that he would trust him and they would go in together as partners; that Lyons said the land could not be bought for less than $3,000 per acre. C. F. Thompson swore the plaintiffs relied upon Lyon's honesty and ability and made no investigation.

On July 11, 1911, the Commercial Bank of Kansas City showed a credit to T. J. Lyons of $15,600.

Plaintiff offered a deed dated July 20, 1911, from the Kaw Valley Town Site & Bridge Company to Fred Meyn, conveying the land in question for a recited consideration of one dollar.

Also a deed dated July 20, 1911, by Meyn and wife, conveying to Thompson a half interest in the land; also a deed dated the same day and recorded on that date, from Meyn and wife to Lyons, for an undivided one-fourth interest reciting a consideration of one dollar.

John W. Merchant, sworn on behalf of plaintiff, testified that the two tracts of land covered by the deed comprised ten acres and a fraction; that he represented the Kaw Valley Town Site & Bridge Company; the amount paid for the land conveyed by the deed was $14,920, and he delivered the deed to Fred Meyn; that at the time he made the deed Meyn asked him to make two extra deeds, one conveying a half interest and one conveying a quarter interest, leaving the names blank; he made these deeds and Meyn took them away with him.

C. F. Thompson was sworn and his evidence supported the testimony of his brother in the essential

facts of the transaction. Other witnesses were produced to corroborate the same details of the transaction. Thompson swore also that plaintiffs did not learn the real consideration paid to the Kaw Valley Town Site & Bridge Company until a short time before the suit was filed.

Fred Meyn was dead at the time of the trial. Defendant Lyons was sworn as a witness and contradicted in detail the testimony of both plaintiffs as to the main issues in the case. He testified in substance that he had contracted to buy two acres of the land in controversy at the rate of $3,000 per acre, and that to accommodate plaintiffs he agreed to take in lieu of same one-fourth of the entire tract; that he received a deed for his one-fourth and paid Meyn therefor at the rate of $3,000 per acre; that he never received any profit over and above that which he paid for his one-fourth interest.

On cross-examination Lyons admitted that he never paid Meyn anything for his one-fourth interest at the time he got the deed, but claimed that Meyn owed him and the matter was settled between them later.

Defendants also offered testimony to show that the value of the land in July, 1911, was $3,000 per acre. Part of this evidence was excluded by the court.

The county record and assessment list for 1910-11 was offered in evidence by defendants, and excluded by the court at the instance of plaintiffs. The record and assessment list disclosed that the 10.81 acres in controversy was assessed for 1910 and 1911 at $30,000.

I. Appellant complains that the petition does not
Cause of state a cause of action for fraud and deceit and
Action.   that the evidence for plaintiffs does not make out a case.

There was no demurrer to the petition, which is set out in substance above, and no objection to its sufficiency taken by motion or otherwise until evidence was offered in its support; then defendants objected to the introduction of any evidence on the ground

that it didn't state facts sufficient to constitute a cause of action; it was good against an objection taken in that manner. It stated definite facts constituting the false representations, to-wit, the purchase price of the land to be bought, and that such representations were false. It stated with sufficient clearness that plaintiffs relied upon those statements and thereby were induced to make the purchase and pay for their half interest more than the total price for the whole.

The evidence as briefly stated above shows that the allegations of the petition were supported. There was substantial evidence to show that the false representations alleged actually were made, that the money actually was paid by plaintiffs and received by the defendants; that the plaintiffs were deceived by the representations and thereby induced to part with the money. The defendants denied the allegations of the petition and introduced testimony tending to controvert the truthfulness of the statements made by the plaintiffs and their witnesses. Whether in fact the evidence offered by plaintiff was true was a question for the jury to determine, and by their verdict the jury found it to be true. That finding is conclusive upon this court.

II.    Appellant correctly says the Kansas Statute of Limitations applies to the cause of action stated, because the transaction occurred in Kansas. [Sec. 1895, R. S. Mo. 1909.] The Kansas Statute of Limitations provides that a suit can only be brought within two years "in an action for relief on the ground of fraud—the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." It is claimed that the statute bars the action in this case because there was no pleading, nor facts proven, to show there was reasonable diligence used to discover the fraud.

Kansas cases are cited construing the statute. Those cases hold in effect that where the means of knowledge is within reach of the party defrauded he is presumed to have knowledge of the fraud. In each

*Limitations: Fraud: Diligence.*

one of them, however, *there was constructive notice;* that is, there was an administrator's settlement, or the record of a deed, showing the facts which were concealed from the party defrauded. The rule obtaining in Kansas is laid down in the case of Hutto v. Knowlton, 82 Kan. 445, l. c. 448, as follows:

"Where a public record is required by law to be kept as a source of information respecting property-rights and interests, a duty rests upon anyone to whom the information is material to improve with diligence the opportunity of learning that which the record discloses. . . . But the rule is no broader than its basis, and if for any reason no obligation exists to consult the record, or if the interested person be circumvented from taking advantage of his opportunity, the rule does not obtain.

"There is no obligation resting upon a landlord to watch the records for tax deeds fraudulently taken out by his tenant [citing cases]. Where fiduciary relations exist requiring the disclosure of the true state of facts there is no reason to anticipate unfaithfulness, and the obligations to search the records is relaxed [citing cases]. Likewise, if a party be prevented by fraud from availing himself of the benefit of the record, or be led by such means to forego an investigation of the record, no one participating in the fraud can insist upon the enforcement of the duty to do so. We have here just such a case. The records were not accessible to the appellant, who lived in a distant state. Ellis understood to impart the very information, which if his statements were true, the records would have furnished. The appellant had no reason to question his veracity, and the law did not oblige her to do so. She had the right to accept his representations as true, and to rely upon them as faithful disclosures of what she would discover from the records if she consulted them."

It is claimed here that the records of the Kaw Valley Town Site & Bridge Company showed the actual consideration which Fred Meyn paid for the property was $14,920, instead of more than $32,000 as represent-

ed by him. But the plaintiffs had no access to the books of that corporation, no right to examine them and in fact no right to ask anyone in custody of them what they showed. It wasn't a record which imparted notice to them.

It is true the deed of the company to Meyn recited a consideration of one dollar and that appears of record and imparts notice, but it did not impart notice of any fraud. It is held by the Kansas Supreme Court in the case of Kline v. Cowan, 84 Kan. 776, that a record imparts only notice of what it contains. The court says:

"But where the recorded instrument, as in this case, furnishes no evidence of the fraud, constructive knowledge thereof cannot be imputed."

And in the case of Underwood v. Fosha, 96 Kan. l. c. page 551, the Supreme Court of Kansas said: "The record of the deed imparts notice of everything contained therein. It does not impart notice of matters wholly outside the deed."

Doubtless the plaintiffs knew from the start that the deed executed by the corporation recited a consideration of one dollar and it was at that very time they were told by defendants that the consideration was in excess of thirty-two thousand dollars. The deed did not disclose the real consideration, and it would not suggest any reason for failure to state the true consideration other than that which often prevails in real estate deals—that it might facilitate a further negotiation of the land. The fact that the true consideration was not stated would not necessarily require the plaintiffs to make any further inquiry than *to ask their friends,* with whom they were in partnership and whom they trusted, what the real consideration was. So there was no showing which would set the Kansas Statute of Limitations in operation.

Applying the Missouri doctrine to the facts, the case most favorable to appellants is Hays v. Smith, 213 S. W. 455. In that case it was represented to the plaintiff that a certain tract of land could not be bought for less than seventy-five dollars an acre and he was in-

duced to pay that for it, when in fact the agent who
made the representations paid only fifty dollars an acre
for it. It was held that the statute began to run from
the time the trade was made, because the plaintiff
should have discovered the fraud that had been prac-
ticed upon him. In that case the party who made the
representations was not the agent of the purchaser, but
the agent of the seller. Plaintiff himself testified that
inside of a year he learned that the land would sell for
fifty to sixty dollars an acre. He learned all about the
land and knew that it was not worth what he paid for
it. The opinion in that case also emphasizes the fact
that the purchaser was dealing with the agent of the
other parties at arm's length; his suspicions were
aroused at the start, and he says he was "juberous"
about the land being worth what he paid for it when
he made the trade, and that he didn't care about asking
the price of the land because he didn't want to make
the agent out a liar in the presence of the owner. A
number of circumstances in that case suggested to the
purchaser that he should make inquiry.

That case differs from the present case in all these
particulars. Here the parties making the representa-
tions were partners of the plaintiffs. Plaintiffs had a
right to rely upon their representations. Not a single
fact was brought to their knowledge which would tend
to arouse suspicion that their partners were not dealing
in good faith with them. It is even pointed out by
appellants that the land was actually worth $3,000 an
acre, so that any inquiry regarding values would not
have revealed the fraud.

This court has announced the same doctrine as the
Kansas courts of constructive notice being equal to
actual notice of the fraud so as to put the Statutes of
Limitations in operation. [Hudson v. Cahoon, 193 Mo.
547.] But has also laid down certain principles which
govern the application of the statute. In the case of
Monmouth College v. Dockery, 241 Mo. 522, l. c. 552,
the court said:

29—281 Mo.

"If there was nothing in the transaction at the time, or nothing occurring later, to cause a reasonably prudent man to suspect fraud, he is not guilty of negligence in failing to ferret it out."

On page 559 the same opinion, quoting from an Illinois case, says:

"The failure to use ordinary diligence to discover the fraud may be excused where there exists some relation of trust and confidence, as principal and agent, client and attorney, *cestui que trust* and trustee between the party committing the fraud and the party who is affected by it, rendering it the duty of the former to · disclose to the latter the true state of the transaction, and when it appears that it was through confidence in the party who committed the fraud that the other was prevented from discovering it."

On the same page the court approved of another case where the relation of confidence was that of a partner, and the court says in the case of the partner, l. c. 559:

"But here there was a positive representation made by a party whose position required of him the utmost good faith, and that representation was a concealment of the cause of action. Whatever may be the rule where no relation of trust and confidence exists, we are clear that where the relation does exist, as in this case, the bar of the statute cannot avail the party who misleads his partner."

A still later case, Laird v. Keithley, 201 S. W. 1138, l. c. 1142, in the opinion of Judge Woodson, this court held:

"It is next insisted that, even though the respondent did not know of the fraud at the time of the completion of the trade, yet by the exercise of ordinary and reasonable care and prudence he could have ascertained the fraud before the five years expired, and for that reason the demurrer should have been sustained. This insistence is equally untenable. The respondent testified that he relied entirely upon the representations made to him by appellant and his agents regarding the char-

acter of the soil and the productions of the Ralls County land, and that he did not rely upon his own observations, which, the evidence tended to show, were hurried, casual and limited, a mere bird's-eye view, and in no sense an inspection of the land within the meaning of that term; also that certain material facts were concealed from respondent, which, coupled with the misrepresentations mentioned, threw him off his guard and lulled him into the belief that the Missouri farm was as represented to him. Under those conditions the law is well settled that the defrauded party is under no legal obligation to investigate the honesty of the transaction, but may rely upon the representations of the vendor to be true.''

The weight of authority is against the position taken by appellant in regard to plaintiff's duty in discovering the fraud.

III.  It is claimed by appellants that the pleading of plaintiffs in avoidance of the Kansas Statute of Limitations was insufficient to show reasonable diligence in discovering the fraud. The petition stated

Pleading:
Diligence.

that the fraud was not discovered until June, 1916.

This court in the case of College v. Dockery, 241 Mo. l. c. 554, said, in a case of this character:

"If the plaintiff merely states that he did not discover the fraud until a certain date, and the defendant, without questioning the sufficiency of the pleading, goes to trial on that issue, . . . he cannot, on appeal, complain of the defect in the pleading.''

The court then further said: "There was no demurrer filed in this case, and no objection to the evidence on the specific ground of this alleged defect,'' and held the pleading sufficient.

In this case the petition was sufficient, and besides the replies averred that the facts "constituting the fraud pleaded in the plaintiff's amended petition were not discovered by plaintiffs until June, 1916.'' The replies further alleged that plaintiffs were misled and

prevented from discovering the fraud, and that the defendants concealed the fact from which it might have been discovered.

Before any testimony was introduced the defendants' counsel objected to the introduction of any evidence on the ground that the petition did not state facts sufficient to constitute a cause of action and mentioned several specific objections to the petition, but did not state any objection on the ground that it contained no allegation of facts which would remove the bar of the Statute of Limitations. The replications of the plaintiffs were not mentioned in any objection as being insufficient in any particular. It will be noted the plaintiff did not need to plead such facts in the petition because the Statute of Limitations of Kansas was not in issue until pleaded in the answer; then such facts were properly pleaded in reply, and no objection to the sufficiency of the reply was made.

IV. The appellants claim that the Missouri Statute of Limitations would bar the action. In addition to what is said above it may be noted that this action was begun June 27, 1916. The trade was actually closed up and the fruits of the fraudulent transaction received by the defendants about July 20, 1911, so the suit was actually begun within five years from the time the trade was closed.

**Limitations:**
**Missouri Statute:**
**Death of Defendant.**

But the appellant claims, inasmuch as the petition was amended, making Strother, administrator of Meyn, defendant, at the September term, 1916, and since the trade was consummated in July, 1911, that more than five years had elapsed before Strother was sued, and therefore the suit as against him is barred.

The amended petition alleges that Fred Meyn died the twenty-second day of April, 1916. There is nothing to show when his administrator was appointed. It appears to have been after the suit was begun and immediately before the amended petition was filed. The time elapsing between the death of the decedent and the

appointment of his administrator is excluded from the computation of time the Statute of Limitations runs. [Nelson v. Haeberle, 26 Mo. App. 4; McKinzie v. Hill, 51 Mo. 303.; Little v. Reid, 75 Mo. App. 266, l. c. 269; Hinshaw v. Warren, 167 Mo. App. 365, l. c. 368.] There seems to be an interval of three or four months between the death of Meyn and the appointment of his administrator during which the statute did not run.

V.   Another reason urged why plaintiffs should not recover is that they, with the defendants, had entered into an illegal contract or scheme, out of the operation of which scheme the liability arose.

**Fraudulent Scheme.**

An instruction was asked by defendants directing the jury to find for defendants "if the plaintiffs and defendants purchased the land in controversy with the understanding that the defendants were to use their official positions for the sale thereof." The court gave the instruction after adding: "unless the defendants *acted* fraudulently as set out in other instruction." That action of the court, appellant claims, was error.

Mr. Lyons represented, so the evidence goes, that on account of his office he knew the inside of all the work of the railroad and the Terminals, and this was a piece of ground they expected daily the Terminal would buy. He also stated that they were members of the Drainage Board and for that reason did not want the plaintiffs known in the deal.

The appellants cite a number of cases where the courts have refused to enforce contracts based on lottery schemes, gambling arrangements, and immoral or unlawful undertakings. None of these cases are in point because this is not an action to *enforce a contract, nor for the breach of a contract.* It is an action for fraud and deceit. While the courts refuse to grant relief to either party in a suit on a contract which is against public policy, yet where one of the parties is defrauded by reason of the transaction he may recover for fraud and deceit. [McNamara v. Gargett, 68 Mich. 454, l. c. 462;

Hess v. Culver, 6 L. R. A. 498; 12 R. C. L. top page 399.] The difference between enforcing illegal contracts, and asserting title to money which has arisen from them, or alleging fraud in being induced to enter them, is pointed out in numbers of cases. [McBlair v. Gibbes, 58 U. S. 231, l. c. 235-7; Smith v. Blachley, 68 Am. St. 887, l. c. 891.] The Supreme Court of Kansas has passed upon this proposition in the case of Jones v. Inness, 32 Kan. 177, l. c. 181. In that case one person made another drunk and while the latter was under the influence of liquor, induced him to bet on a game of cards and obtained his money in the gamble. Gambling was contrary to law and the whole proceeding was illegal, yet plaintiff could recover on account of the fraud. So, also, Hall v. Corcoran, 107 Mass. 251, l. c. 256; Loomis v. People, 67 N. Y. 322.

This court had occasion to pass upon this very question in case of Hobbs v. Boatwright, 195 Mo. 693. That was a suit to recover six thousand dollars on the ground that it was obtained by a fraudulent scheme of the defendants. It was shown that the plaintiff was induced to bet on a foot race to be "framed" so that he would win. The race was "framed" but so that he *lost* the six thousand dollars. The court explains the principle, pp. 727-728:

"The petition states in substance that the defendants Boatright and others had, prior to the grievance complained of, conspired to have what it calls fake foot races run at Webb City on which strangers were enticed to bet and that the races were so fixed in advance that whichever one of the racers a stranger should bet on was sure to lose, that schemes to entice strangers were devised, and that plaintiff was caught in one of these schemes and inveigled into putting $6,000 into the hands of Boatwright as stakeholder on what plaintiff supposed was a race, with the result that the man he bet on, who was one of the conspirators, was beaten in the race, as it was previously agreed between him and his co-conspirators he would be, and so plaintiff lost his money, and that the defendants, the Exchange Bank

and J. P. Stewart, aided and abetted Boatright and his gang in perpetrating the fraud.

"If the petition was intended to state a cause of action under Section 3424 as for moneyi lost at gambling, there is a good deal more of it than necessary. Fraud or unfairness in the game is not essential to the right of action given by that statute; and on the other hand, if there was no such statute the petition states a right of action at common law, that is, that defendants Boatright and others obtained the plaintiff's money by a fraudulent scheme in which they were assisted by the bank and its cashier Stewart. That is that the petition means."

In this case, if, by some stretch of construction, it may be said that plaintiffs were led to enter the deal because defendants represented that they would unlawfully procure a sale of the land on account of their official positions, the plaintiffs probably could not have enforced the contract in any kind of an action; but, if the defendants by misrepresentations of certain facts induced the plaintiffs to enter the illegal contract and defrauded them of their money, they can't resist recovery on the ground that the scheme was unlawful.

VI. The defendants asked an instruction directing the jury that if at the time the plaintiffs bought, the land was reasonably worth three thousand dollars an acre they should render a verdict for the defendants. The court refused the instruction, and it is claimed the ruling was error. On the measure of damages the jury were instructed, if they found for plaintiffs, to assess their damages at the difference between what the plaintiffs paid Lyons and Meyn for the half interest which they got and one-half of the amount which Lyons and Meyn actually paid the Kaw Valley Town Site & Bridge Company for the entire tract. Appellants claim this was error, and assert that the true measure of damages is the difference between actual value of the land and the price which the plaintiffs paid for it, on the theory that if the land was worth as much

*Measure of Damages.*

as the plaintiffs paid for it plaintiffs were not damaged.

The measure of damages for misrepresentations inducing the purchase of land, or other roperty, depends upon the nature of the misrepresentations. If the false statements which induced the trade were as to quality, condition or any fact which would enter into the value of the land, the measure would be the difference between the actual value and the value as it would have been if the property had been as represented. [Sigafus v. Porter, 179 U. S. 116; Stoke v. Converse, 38 L. R. A. (N. S.) 465, note.] But where one person makes a purchase for another, or where one of two or more joint purchasers conducts a joint purchase, and falsely represents to the others that the price is greater than is actually paid for the property, the measure of damages is always the difference between the amount actually paid by the party defrauded and the true purchase price of the interest which he acquired. [Pickett v. Wren, 187 Mo. App. 83; 20 Cyc. 141; Johnson v. Gavitt, 114 Iowa, 183; Bergeron v. Miles, 88 Wis. 397; Rutledge v. Tarr, 95 Mo. App. 265, 268; McLain v. Parker, 229 Mo. 68. See also case of Pendergast v. Reed, 96 Am. Dec. 541.]

Appellants cite the case of Thompson v. Newell, 118 Mo. App. 405, l. c. 415-16, in support of their position that the measure of damages was the difference between the actual value and the amount paid. That case, as some other cases, holds that where a seller induces a purchaser by misrepresenting the price which the article sold cost *him*, that is the measure of damages unless the original cost enters as a term in the contract. It will be seen from the discussion of the principle on page 415 of that case that the correct rule as stated above is approved. This was not a case where the defendants *sold* the land to plaintiffs by simply stating what it had cost them at some previous time. The plaintiffs and defendants went in together as joint purchasers; the defendants acted for the plaintiffs in the matter; and in every case where the facts are of that nature the measure of damages is as stated above. The

plaintiffs in fact were damaged in exactly the amount they paid defendants for the land in excess of what it actually cost. Whether or not they made, or might have made, money on the deal, makes no difference whatever in their right to recover or in the measure of their damages. [Pickett v. Wren, 187 Mo. App. 1. c. 90, 91.]

The record before us and the briefs filed show the case was fought through on both sides with great vigor and pertinacity. Some points are made by appellants in regard to matters collateral to the main issues. These are answered by what has been said above.

The judgment is affirmed. *Railey C.,* dissents; *Mozley, C.,* concurs.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.